**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| Kathleen A Rabon, | Case No. 25-21127 (JJT) |
| Debtor. | Re: ECF No. 20 |

**MEMORANDUM OF DECISION**
**GRANTING MOTION FOR RELIEF FROM STAY**

Before the Court is the Motion for an In Rem Order for Relief from Stay

Pursuant to 11 U.S.C. § 362(d)(4) (Motion, ECF No. 20), filed by Elaine Malchman,[1]

Richard Russ, and Richard Rothstein, Trustee (together, Movants). For the

following reasons, the Court grants in rem relief.

1.  Background

On September 7, 2010, Mark Rabon executed a Note in favor of Savings

Institute Bank & Trust Company in the original principal amount of $231,000. To

secure the Note, Mark Rabon and the Debtor granted a mortgage on 34 Krug Road,

Preston, CT (Property) to Savings Institute that same day. Payments on the Note

ceased by April 15, 2016.

On October 2, 2018, Savings Institute filed a foreclosure complaint against,

among others, the Debtor and Mark Rabon to foreclose on the Mortgage.[2] Savings

Institute then merged with and into Berkshire Bank in 2019, which was substituted

---

[1] References to "Malchman" are to Elaine, not Daniel.
[2] *See Savings Inst. Bank & Trust Co. v. Rabon*, No. KNL-CV18-6037411-S (Conn. Super. Ct.). The Court has taken judicial notice of the foreclosure action.

in as plaintiff in the foreclosure action. After years of litigating, including various spurious motion practice by Mark Rabon and Edwin C. St.Germain (who is the Debtor's brother),[3] the Superior Court entered a judgment of foreclosure by sale on February 24, 2022 (Foreclosure Judgment).[4] Appeals to and motions with the Connecticut Appellate Court followed, all concluded in Berkshire Bank's favor.[5] The Debtor and Mark Rabon then filed a series of seesaw bankruptcy petitions. Mark Rabon filed a Chapter 13 case on March 13, 2024, which was dismissed on October 29, 2024. The Debtor then filed a Chapter 13 case on January 30, 2025, which was dismissed on April 15, 2025.[6] Mark Rabon followed up with a Chapter 7 case filed on May 5, 2025, which resulted in a discharge being granted on August 14, 2025. The Debtor then filed the instant Chapter 7 case on October 24, 2025.[7] The first three of these cases all came before either scheduled judicial foreclosure sale dates or law days.[8] Each of these cases has had the effect of delaying the foreclosure process.

---

[3] On February 13, 2021, Mark Rabon quitclaimed a one-eighth interest in the Property to St.Germain. Whether this interest is one-eighth of Mark Rabon's interest (and thus one-sixteenth) or one-eighth overall is immaterial.

[4] References to the Foreclosure Judgment include all subsequent entries of judgment.

[5] One of the appeals was dismissed as frivolous. *Savings Inst. Bank & Trust Co. v. Rabon*, No. AC 46149 (Conn. App. Ct. April 12, 2023).

[6] During the pendency of the Debtor's prior Chapter 13 case, the Court granted relief from the automatic stay under 11 U.S.C. § 362(d)(1), finding that cause existed in part due to the Debtor's and Mark Rabon's "advancement of spurious and meritless challenges to claims and liens over four years made solely to delay or impede these proceedings."

[7] The Court takes judicial notice of all four bankruptcy cases noted. *In re Rabon*, No. 24-20201 (Mark; filed March 13, 2024); *In re Rabon*, No. 25-20100 (Kathleen; filed January 30, 2025); *In re Rabon*, No. 25-20466 (Mark; filed May 5, 2025); *In re Rabon*, No. 25-21127 (this case; filed October 24, 2025).

[8] The judgment of foreclosure by sale was converted to a judgment of strict foreclosure on April 2, 2025, after the total debt owed exceeded the fair market value of the Property.

In February 2025, St.Germain began communicating with counsel for Berkshire Bank regarding a purchase of the Note. In March 2025, Berkshire Bank agreed to sell the Note for $200,000 and releases from the Debtor, Mark Rabon, and St.Germain. In April 2025, St.Germain was attempting to obtain the necessary funds from Xanadu Capital. By early May, such efforts had failed, and St.Germain quickly turned to seeking the funds from Daniel Malchman. Rather than lend St.Germain the money directly, Daniel Malchman had Malchman (his wife) and Russ (his wife's brother) put up the money.

Things moved very quickly, chaotically, and disjointedly at this point. In order to stall a pending law day, Mark Rabon filed his Chapter 7 case on May 5, 2025. St.Germain and Attorney Frank Liberty (who represented Malchman and Russ) exchanged terms for Malchman and Russ to lend $260,000 to St.Germain so that he could purchase the Note, pay off outstanding property taxes, pay closing costs, and other miscellaneous costs.[9] In anticipation of a potential agreement, Malchman and Russ each placed $125,000 in escrow with Attorney Rothstein. The negotiations, however, did not result in a material accord evidenced by a signed lending agreement, largely because St.Germain, as borrower, insisted on his terms, which were unacceptable to Malchman and Russ. Despite there being no lending agreement, St.Germain directed Attorney Rothstein to disburse the $200,000 to Berkshire Bank on May 9, 2025 in order to purchase the Note, along with amounts for the outstanding taxes and other costs.

---

[9] Although Malchman and Russ each contributed $125,000, the parties anticipated a loan of $260,000, which would include points.

By the end of May 2025, Attorney Liberty had sent a proposed agreement to St.Germain, but St.Germain unequivocally rejected any proposal that did not recognize him as the sole buyer of the Note. St.Germain blamed Daniel Malchman's "eleventh hour tactic to get his wife and Russ named as co-assignees[,]" which St.Germain stated "kind of pissed me off[.]"[10] St.Germain, having initiated the Berkshire Bank transaction, unilaterally believed that he should own and control the Note. Attorney Liberty, however, testified that St.Germain's loan approach was improvident and unacceptable, as it would render his clients unsecured creditors vulnerable to loss. Understandably, the risks of loss in St.Germain's approach were too significant. As a consequence, no agreement was ever reached by St.Germain and Malchman and Russ.[11]

Meanwhile, in Mark Rabon's Chapter 7 case, the Movants moved for relief from stay under 11 U.S.C. § 362(d)(1), so as to continue the foreclosure process in the Superior Court. That motion went unopposed by the Debtor, Mark Rabon, and St.Germain and was subsequently granted.

The Debtor then filed the instant case on October 24, 2025. By operation of law, the stay against the Debtor expired after 30 days because the Debtor's prior Chapter 13 case had been dismissed within one year of the petition date in this case. *See* 11 U.S.C. § 362(c). The Movants filed the Motion on December 5, 2025,

---

[10] Among the disagreements between the parties was whether Malchman and Russ would be designated as trustees, as Attorney Rothstein was.

[11] Although St.Germain had checks tendered to Attorney Liberty for interest payments, Attorney Liberty did not accept these checks because (1) he was not authorized to do so and (2) Malchman and Russ contended that the amounts tendered were incorrect.

seeking in rem relief from the automatic stay and for cause. The Debtor and St.Germain filed objections (ECF Nos. 21, 23, 32). The Court then held hearings on January 23 and February 5, 2026, and determined that an evidentiary hearing was required. Evidence was then received at hearing on February 10 and 17, 2026, and then the parties submitted their post-hearing briefs. The Court then took the matter under advisement.

2. Jurisdiction

2.1 Authority

The United States District Court for the District of Connecticut has jurisdiction over the instant proceedings under 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court under 28 U.S.C. § 157(a) and (b)(1) and the General Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984. This contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

2.2 Standing

Beyond the Court's constitutional and statutory authority to hear and decide this matter, two separate issues of standing (or at least authority to act) have been raised by the Debtor and St.Germain (together, Objectors). First, the Objectors have contested whether Attorney Rothstein was Attorney Chorches's client, raising issues of his authority to act on behalf of all of the Movants. Second, the Objectors

have contested ownership of the Note, claiming that such dominion resided in Attorney Rothstein alone or St.Germain. The Court addresses each in turn.

2.2.1 Rothstein

By the conclusion of the hearings, the parties no longer contested the issue of whether Attorney Rothstein authorized the filing of the Motion by Attorney Chorches. Some discussion is nonetheless warranted. In his objections (ECF Nos. 23, 32) to the Motion, St.Germain stated that Attorney Rothstein was not a client of Attorney Chorches as it pertains to the instant case.[12] Attached to the second objection was an affidavit from Attorney Rothstein stating that no one was representing him "before the Courts" related to the Note and Mortgage. It bears noting that this affidavit was prepared by his long-time friend St.Germain and given to Attorney Rothstein to sign and file in this proceeding.

In his testimony before the Court, Attorney Rothstein appeared hopelessly confused about what had transpired; however, he consistently stated that he wanted whatever relief would lead to the termination of his duties as escrow agent regarding the Note and Mortgage. When asked if he would presently authorize Attorney Chorches to seek in rem relief, he unequivocally responded in the affirmative. In effect, Attorney Rothstein has ratified the filing of the Motion, mooting this issue. The Objectors later noted no issue with Attorney Chorches's

---

[12] St.Germain does not contest that Attorney Chorches had a signed retention letter for Attorney Rothstein pertaining to Mark Rabon's 2025 bankruptcy filing, but no such instrument of written retention or authorization of continued representation exists.

6

authority to file the Motion, pressing instead their arguments about ownership of the Note and Mortgage, to which the Court now turns.

### 2.2.2 The Note

The parties also disagree about the ultimate ownership of the Note, along with the Mortgage and the Foreclosure Judgment.[13] Under 11 U.S.C. § 362(d), a motion for relief from the automatic stay must be brought by a "party in interest." "A lift stay motion cannot be brought by a stranger to the case." *In re Garcia*, 584 B.R. 483, 487 (Bankr. S.D.N.Y. 2018).

> [T]he level of proof necessary to demonstrate standing to seek stay relief to commence or continue a mortgage foreclosure action must be somewhere along the spectrum of providing some evidence of a litigable right or colorable claim at one end, to, at the other end, demonstrating that the movant holds a valid, perfected and enforceable lien and more likely than not will prevail in the underlying litigation stayed by the bankruptcy filing.

*In re Escobar*, 457 B.R. 229, 237 (Bankr. E.D.N.Y. 2011). Malchman and Russ argue that they are the owners of the Note. St.Germain counters that he is the sole owner of the Note, or that it should be deemed his through a constructive trust. Because St.Germain's arguments implicate whether the Movants have any "litigable right or colorable claim" at a minimum, it is necessary to decide the ownership of the Note, along with the Mortgage and Foreclosure Judgment.[14]

---

[13] Further references to the Note include the Mortgage and Foreclosure Judgment.

[14] Although the ownership claim is a "related to" issue, *see* 28 U.S.C. § 1334(b), and arguably requires an adversary proceeding, *see* Fed. R. Bankr. P. 7001(b), the issue is "inextricably intertwined" with the core proceeding regarding stay relief, *see* 28 U.S.C. § 157(b)(2)(G). *Cf. Stern v. Marshall*, 564 U.S. 462, 499 (2011) (holding that counterclaim did not meet public rights exception because it would not "necessarily be resolved in the claims allowance process"). In any regard, the parties repeatedly asked this Court to decide the ownership issue, such that there is express consent.

St.Germain was indisputably the one who set the transaction in motion. After receiving word that Berkshire Bank would sell the Note, Mortgage, and Foreclosure Judgment for $200,000, he worked to find a lender. After Xanadu fell through, he turned to Daniel Malchman, who acted on behalf of Malchman and Russ. Although many of the terms for borrowing $260,000 were hashed out between the two sides, fundamental disagreements remained, including regarding payments, taxes, insurance, and, most notably, ownership and dominion over the enforcement of the Note. On the day of the closing, despite there being no executed agreement to loan monies to the transaction, St.Germain directed Attorney Rothstein to release the funds.[15] St.Germain insists that he owns the Note (despite an absence of a meeting of the minds of the parties), and on terms that he dictated. But as the party who was seeking to borrow money, he plainly was in no position to demand that his terms rule the day. By all sober counts, the loan proposed transaction was botched, bungled, and lacked definitiveness.

The absence of an executed agreement implicates the Statute of Frauds. Under Conn. Gen. Stat. § 52-550(a):

> No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: (1) Upon any agreement to charge any executor or administrator, upon a special promise to answer damages out of his own property; (2) against any person upon any special promise to answer for the debt, default or

---

[15] Despite casting his role as a lawyer to the transaction, Attorney Rothstein effectively acted on St.Germain's behalf and at his direction. *See* Ex. B (St.Germain tells counsel for Berkshire Bank that Attorney Rothstein was St.Germain's designee); Ex. E (St.Germain tells Attorney Liberty that Attorney Rothstein "is standing in my place in this transaction"). In effect, he was St.Germain's lawyer while simultaneously working with his other "friends," Malchman and Russ. But a lawyer cannot represent both sides without informed consent in writing. *See* Conn. R. Prof. Conduct 1.7(a)(1), (b)(4).

miscarriage of another; (3) upon any agreement made upon consideration of marriage; (4) upon any agreement for the sale of real property or any interest in or concerning real property; (5) upon any agreement that is not to be performed within one year from the making thereof; or (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars.

Each of subsections (4), (5), and (6) are met by this bungled transaction. Under Connecticut law, the Note, Mortgage, and Foreclosure Judgment are indisputably interests in real property. The borrowing transaction, as proposed, would have been for a term of two years, which axiomatically could not have been performed within one year. The proposed loan amount of $260,000 is well in excess of $50,000. Thus, under multiple grounds, the Statute of Frauds dictates that the proposed borrowing agreement is unenforceable.

Instead, Berkshire Bank accepted $200,000 and, in exchange, assigned the Note to the Movants. Because there was no executed agreement between St. Germain and Malchman and Russ regarding the nature of the loan transaction, the Note became the property of the Movants, each to the extent that they provided the money for the purchase. Because Malchman and Russ put up equal amounts of money, they each are the respective half owners of the Note. St.Germain, however, provided no money and thus (despite his unrealized aspirations) has no interest, in

9

law or in equity,[16] whether in his own right or through Attorney Rothstein as his purported trustee.[17]

The Debtor argues, however, that, because the competing proposals lay out many of the essential terms and St.Germain attempted to make payments under his proposed loan transaction, the Statute of Frauds is somehow overcome by this part performance and that this Court can supply the missing terms in their scrambled transaction. In Connecticut, part performance requires "(1) statements, acts or omissions that lead a party to act to his detriment in reliance on the contract; (2) knowledge or assent to the party's actions in reliance on the contract; and (3) acts that unmistakably point to the contract." *U.S. Bank, N.A. v. Eichten*, 184 Conn. App. 727, 779, 196 A.3d 328, 362 (2018). None of these elements is met. Moreover, such would require that the essential terms of the contract be agreed upon. Here, for instance, the parties *still* dispute whether taxes and insurance were to be included in the payments made to Malchman and Russ.[18]

---

[16] Although St.Germain has argued that he would not have provided or secured releases from the Debtor, Mark Rabon, and himself if he knew the transaction would not be as he envisioned it, he has provided no evidence of what those releases were worth. The Court cannot attribute any value to the releases. Notably, he directed the closing and delivery of the releases in the cloud of confusion and transactional uncertainty.

[17] The corollary to this is that Attorney Rothstein as trustee has no ownership interest *at all* because he is the nominal trustee for a null interest. Accordingly, the Note, Mortgage, and Foreclosure Judgment belong to Malchman and Russ alone and all further references to the "Movants" in this Memorandum of Decision exclude Russ.

[18] St.Germain's argument that taxes were prepaid does not account for taxes that he, the Debtor, and Mark Rabon have *not* paid since the transaction. Moreover, St.Germain's arguments and evidence regarding the homeowners insurance ignore that the Debtor and Mark Rabon, at St.Germain's insistence, made Malchman and Russ the third loss payees, after St.Germain and Attorney Rothstein, despite the fact that the latter two have made no monetary contributions to the purchase of the Note. Malchman and Russ were right to insist that their interests be paid ahead of St.Germain's nonexistent one.

The Debtor's argument that this Court can fill in the gaps of the parties' negotiations is likewise without merit. Although the Connecticut Supreme Court has said that it has "long held that an agreement will not be rejected if the missing terms can be ascertained, either from its express terms or by fair implication[,]" *Presidential Cap. Corp. v. Reale*, 231 Conn. 500, 507–08, 652 A.2d 489, 493 (1994), such "gap-fillers are implied not because they are just or reasonable, but rather for the reason that the parties must have intended them and have only failed to express them or because they are necessary to give business efficacy to the contract as written, or to give the contract the effect which parties, as fair and reasonable persons, presumably would have agreed if, having in mind the possibility of the situation which had arisen, they contracted expressly in reference thereto." *Id.*, 231 Conn. at 508, 652 A.2d at 493 (cleaned up).[19] In other words, such must be implied based upon what the parties have expressly agreed upon *in their written contract.*

We are thus presented with a chicken-and-egg problem. There can't be part performance because there were gaps in what performance would look like. But there can't be gap-filling because there wasn't a written agreement to begin with. The Court simply can't force on the parties an accord that they have not already agreed to. Although both sides concurred on many of the terms, too many essential terms were left unresolved here.

---

[19] The Debtor cites this case and one other in her brief. Although there is similar language in the case, the Debtor's "quoted" language appears nowhere in the opinion. The other cited case has nothing to do with the cited proposition, and the "quoted" language is also nowhere to be found within it. The Debtor's counsel will separately be ordered to show cause as to why he should not be sanctioned under Rule 9011 of the Federal Rules of Bankruptcy Procedure for providing the Court with these apparently false citations.

> In order to form a binding and enforceable contract, there must exist an offer and an acceptance based on a mutual understanding by the parties. The mutual understanding must manifest itself by a mutual assent between the parties. In other words, in order for an enforceable contract to exist, the court must find that the parties' minds had truly met. If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them *and the court will not make for them a contract which they themselves did not make.*

*Bay Advance, LLC v. Halajian*, 236 Conn. App. 228, 235, 347 A.3d 1207, 1213 (2025) (cleaned up) (emphasis added). With no contract formation and no ability to fill gaps, there can't be part performance. There is simply no enforceable contract between, on the one hand, St.Germain, the Debtor, and Mark Rabon and, on the other hand, Malchman and Russ.

Absent such an agreement, St.Germain argues that the Note should be his through the Court's imposition of a constructive trust.

> A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. The imposition of a constructive trust by equity is a remedial device designed to prevent unjust enrichment. Thus, a constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it.

*Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 466, 970 A.2d 592, 617 (2009) (cleaned up). A party "seeking recovery for unjust enrichment must prove (1) that the [counterparties] were benefited, (2) that the [counterparties] unjustly did not pay the [party] for the benefits, and (3) that the failure of payment was to the [party's] detriment." *Id.*, 291 Conn. at 451–52, 970 A.2d at 609.

12

St.Germain has failed to show unjust enrichment. First, Malchman and Russ have not been benefited. They provided the funds that Berkshire Bank indicated it would accept for the Note.[20] This was an arm's-length exchange for a troubled mortgage debt. They also provided the funds to satisfy outstanding property taxes, meaning that not only have they not been benefited, they have been *burdened*. Even if there was some benefit, Malchman and Russ were under no duty or obligation to pay *St.Germain* for that benefit.[21] Instead, St.Germain had proposed to become obligated to Malchman and Russ on his terms. That Malchman and Russ have put up $250,000 and obtained a judgment face-valued at $424,985.91 is Berkshire Bank's loss, not the Debtor's, not Mark Rabon's, and not St.Germain's. There is simply no unjust enrichment.[22]

Addressing St.Germain's other arguments in support of a constructive trust, none is persuasive. In *Cadle Co. v. Gabel*, 69 Conn. App. 279, 794 A.2d 1029 (2002), the Connecticut Appellate Court stated that "[t]here are some situations . . . in which a constructive trust is imposed in favor of a [party] who has not suffered a loss or who has not suffered a loss as great as the benefit received by the [counterparties]." 69 Conn. App. at 289, 794 A.2d at 1037. Because the Court has

---

[20] Any benefit that Malchman and Russ may have derived would have come from Berkshire Bank, which *agreed* to sell the Note at what appears to be a substantial loss. When and whether the Note's value will be realized in this context without undue costs, delays, and legal proceedings is speculative.

[21] Any suggestion that Malchman and Russ did not pay the Debtor and Mark Rabon is patently frivolous. The Debtor and Mark Rabon gave a mortgage to secure the Note. The transfer from Berkshire Bank to Malchman and Russ leaves the Debtor and Mark Rabon in exactly the same position they were in before the transfer in terms of what is owed.

[22] Further, St.Germain has no standing to argue third-parties' potential claim that "[t]o not impose a constructive trust under the circumstances would constitute injustice to Mark and Kathy Rabon."

13

found that there was no benefit to the Movants, at least not in the unjust enrichment sense, this case law does not apply. His citation of *Starzec v. Kida*, 181 Conn. 41, 438 A.2d 1157 (1981), for the proposition that the burden is on the Movants to negate a constructive trust is also inapposite. As he himself quotes, such burden shifting occurs after "a confidential relationship has been established." *Id.*, 181 Conn. at 43 n.1, 438 A.2d at 1159 n.1. The Connecticut Supreme Court noted that "[c]ourts consider two distinct relationships 'confidential' in the context of constructive trusts. In the first, one party is under the domination of another. In the second, circumstances justify a party's belief that his or her welfare or instructions will guide the other's actions." *Id.* Neither of these relationships is present here. Malchman and Russ were proposed to be the lenders to St.Germain. That he may have desired them to be his trustees does not make them so.[23]

In sum, the Note, Mortgage, and Foreclosure Judgment belong to Malchman and Russ, and they accordingly have standing to pursue the Motion. The Court thus proceeds to the merits of whether in rem relief is warranted.

3. Discussion

Because a discharge has entered in this Chapter 7 case (ECF No. 61), there is currently no automatic stay in place.[24] 11 U.S.C. § 362(c)(2)(C). Therefore, the Movants' request for relief from the automatic stay for cause under § 362(d)(1) is

---

[23] St.Germain also argues that a trust (not constructive) should be found to exist. He provides no authority for this other than citation of Conn. Gen. Stat. § 51-81h, which relates to the validity of certain escrow agreements. Because this argument is inadequately briefed, the Court rejects it. Absent a trust, Malchman and Russ have no fiduciary duties to St.Germain.

[24] Accordingly, the Court need not address whether the termination of the stay under § 362(c)(3) applied to only the Debtor or to the Debtor and property of the estate.

14

seemingly moot. The Movants, however, have also requested in rem relief. Under §

362(d)(4), the Court shall grant such relief:

> with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either—
> (A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or
> (B) multiple bankruptcy filings affecting such real property.

11 U.S.C. § 362(d)(4). Additionally, if properly recorded, an in rem order is binding

in any other bankruptcy case affecting the Property for two years. *Id.*

Prior to addressing the merits of whether in rem relief is warranted, the

Court must first address whether it is even available as a legal matter. Because the

Debtor's prior case (No. 25-20100) was dismissed within one year of the filing of this

case, the automatic stay terminated on the thirtieth day after the filing of this case

because no motion to extend the automatic stay was filed or heard. 11 U.S.C.

§ 362(c)(3). Moreover, a discharge has entered in this Chapter 7 case, meaning that,

even absent § 362(c)(3), there is currently no automatic stay. *Id.*, § 362(c)(2)(C). The

question then shifts to, if there is no automatic stay in place, is in rem relief

available?

Courts have split on the availability of in rem relief where the stay either

terminated under § 362(c)(3) or was never in place due to § 362(c)(4). In *In re*

*Perkins*, 609 B.R. 576, 577–81 (Bankr. D. Conn. 2019), Judge Manning determined

that in rem relief was not available where there was no stay in place under

§ 362(c)(4). On the other hand, in *In re Lewis*, No. 16-10352, 2016 WL 2941432, at

15

*2–3 (Bankr. D.R.I. May 18, 2016), Judge Finkle granted in rem relief to the movant bank, despite there being a question of whether under § 362(c)(3) the automatic stay was even in place. *See also In re Kearns*, 616 B.R. 458, 465–68 (Bankr. W.D.N.Y. 2020) (granting in rem relief even where stay had expired under § 362(c)(3)).

Judge Manning noted in *In re Perkins* that the movant could seek dismissal with prejudice or in rem relief under § 105(a). But a bar order against the Debtor cannot stop Mark Rabon or St.Germain from filing for future bankruptcy relief. And this Court has not favored in rem relief under § 105(a) alone. *In re Yeboah*, No. 25-21024 (JJT), 2025 WL 4090551, at *2 (Bankr. D. Conn. Nov. 12, 2025).[25]

Recently, Judge Mastando noted that "Section 362(d)(4) expressly authorizes prospective relief that is 'binding in any other case' affecting the property, including cases filed by third parties." *In re Wallace*, No. 25-12304 (JPM), 2026 WL 194181, at *8 (Bankr. S.D.N.Y. Jan. 26, 2026). "Moreover, nothing in section [362(d)(4)] conditions in rem relief on the continued existence of the automatic stay, and courts have granted such relief where the automatic stay had terminated. . . . [I]n rem relief c[an] be granted independently of the stay because the statute targets abusive repeat filings affecting the property and bars future invocations of the stay as to the same collateral." *Id.* (citation omitted). Considering the facts and circumstances of this case, the manifest abuses of the prior seesaw bankruptcy filings of the Debtor

---

[25] If the Court were to consider § 105(a), it would weight against the Objectors. *See In re Branded Ops. Holdings, Inc.*, No. 22-22608 (JLG), 2026 WL 800385, at *12 (Bankr. S.D.N.Y. Mar. 20, 2026) (discussing cause to issue prefiling injunction).

16

and Mark Rabon, and the near-certain mischief to occur if in rem relief is not granted, the Court is persuaded by this and other cases holding that in rem relief is not foreclosed merely because the stay has expired by operation of law. The Court thus proceeds to the merits of the requested relief.

This is the fourth bankruptcy filed between Mark Rabon and the Debtor affecting the foreclosure of this Property and this debt. All but the current case were filed near a pending sale date or law day. Moreover, St.Germain, who was quitclaimed an interest in the Property in 2021, has indicated to this Court that he will file for bankruptcy protection next, if necessary.

If these circumstances were not enough to convince the Court of a scheme to delay, hinder, or defraud, St.Germain has himself unabashedly admitted as much. In a May 30, 2025 email to Attorney Liberty, St.Germain wrote: "While you are at it, remind [Daniel] Malchman that I kept Berkshire Bank at bay for nine-years and I am willing to go another nine to protect my sister's house." Ex. C at 25 (ECF No. 56). Although he tried to characterize this email as bluster, the Court notes that St.Germain has counseled the Debtor's and Mark Rabon's machinations and accomplished exactly what he bragged about. Therefore, the Court finds that St.Germain has, with the Debtor and Mark Rabon, orchestrated a scheme of delay.

The Objectors note, however, that the Movants are new to the Note and Mortgage, and thus have not been the subject of the scheme to delay, hinder, or defraud. That is a distinction without a difference. The statute does not speak to a scheme to delay, hinder, or defraud a specific creditor but to *all creditors*. Even if it

17

was specific to a certain debt, the Movants have stepped into Berkshire Bank's shoes by having been assigned the Note, Mortgage, *and the Foreclosure Judgment*. Either because there is no difference between Berkshire Bank and the Movants or because one would not matter, there is no such defense available to the Objectors.

As additional support for finding a scheme to delay, hinder, or defraud, the Court notes that that combination of words (although inverting "delay" and "hinder") invokes the formula for an actual intent fraudulent transfer.[26] The traditional badges of fraud in bankruptcy jurisprudence are:

(1) the lack or inadequacy of consideration;
(2) the family, friendship or close associate relationship between the parties;
(3) the retention of possession, benefit or use of the property in question;
(4) the financial condition of the party sought to be charged both before and after the transaction in question;
(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
(6) the general chronology of the events and transactions under inquiry.

*Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582–83 (2d Cir. 1983). Here, the Debtor and her husband have maintained possession of the Property throughout the seven-plus years since the Foreclosure Action was initiated, ostensibly without payment of the Note, insurance, or taxes. During the pendency of the Foreclosure Action, Mark Rabon also quitclaimed an interest in the Property to St.Germain, his brother-in-law, for no consideration. There is no dispute that the Debtor and Mark Rabon have experienced financial distress, with both receiving bankruptcy

---

[26] *See* 3 Collier on Bankruptcy ¶ 362.05[19][a] ("courts may be inclined to look at caselaw construing the 'hinder, delay or defraud' language found in [sections 548(a)(1) and 727(a)] for guidance in applying section 362(d)(4)").

discharges in the last year.[27] The timing of that financial distress, lawsuits by other creditors,[28] and the general chronology of the events and transactions all weigh against the Debtor. In short, *every* badge of fraud points to a calculated scheme to delay, hinder, or defraud, proudly captained by St.Germain.

Based upon these facts and circumstances, the Court finds that the Movants are entitled to in rem relief because the Debtor and Mark Rabon, with the help of St.Germain, have engaged in a scheme to delay, hinder, or defraud creditors through the filing of multiple bankruptcies and the interposing of frivolous arguments to the courts.

4. Conclusion

For the foregoing reasons, in rem relief is granted. A separate order will issue.

IT IS SO ORDERED at Hartford, Connecticut this 3rd day of April 2026.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut

---

[27] St.Germain himself has claimed financial distress that he professes will likely motivate his own future bankruptcy filing.

[28] A review of the Connecticut Superior Court's website shows, other than the foreclosure action, at least twelve other lawsuits by creditors against the Debtor or Mark Rabon since the Note and Mortgage were executed.